GARRITY et al. v. UNITED STATES.

No. 45891.

Court of Claims.

Oct. 7, 1946.

Raymond F. Garrity, of Washington, D. C., for plaintiffs.

John T. Barker, of Kansas City, Mo., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

JONES, Judge.

This is a suit for additional rent in the amount of $245 for the occupancy by the Agricultural Adjustment Administration, Department of Agriculture, from July 1 to August 17, 1941, of the second, third, and fourth floors of plaintiffs' premises known as the Courts Building in Washington, D.C., and for $39.17 for electric current consumed during such period. Defendant paid $851.61 to plaintiffs for such occupancy, prior to this suit, and the sole question is whether plaintiffs are entitled to the additional amounts claimed.

■ It is a well settled general principle of law that when a tenant holds over after the expiration of his lease with the express or implied consent of the landlord and without any new or different agreement as to rent, the terms of the old lease will apply. The Comptroller General invoked this well known principle and denied plaintiffs' claim for increased rent.

It is a good rule. The question is, does it apply to the facts of this case?

■ It is a corollary of the above rule that where, upon the termination of the lease, the tenant is notified by his landlord that if he holds over he will be required to pay a higher rent than that required by the terms of the prior tenancy, the terms of the lease to that extent will not apply, and the tenant will be bound by the terms of the notification, unless he gives timely notice to the landlord of his refusal to be so bound. Moore v. Harter, 67 Ohio St. 250, 65 N.E. 883, 884; Amsden v. Floyd, 60 Vt. 386, 15 A. 332; Williams v. Foss-Armstrong Hardware Co., 135 Wis. 280, 115 N.W. 803, 804; 36 C.J. 1164.

In Moore v. Harter, [67 Ohio St 250, 65 N.E. 884] the court stated:

"It has long been settled in this state that, when a tenant for years holds over after the expiration of his lease, he becomes, at the election of the landlord, a tenant from year to year, and, in the absence of any new agreement with the landlord, he holds under the terms of the original lease * * *. It follows that the lessor and lessee may by agreement change the terms of the original tenancy; and if, before the beginning of another year the landlord notifies the tenant that the rent will be increased, and the latter nevertheless holds over into another year, to that extent the terms of the original lease will not apply, but it will be applicable in all other respects. The reason for this is that the tenant must be presumed to have assented to the change. The authorities are numerous and conclusive on this point."

■ From the foregoing authorities and the numerous decisions of other jurisdictions therein cited, and more particularly from those authorities which hold that this result will follow even though the tenant objects to the new conditions, provided the holding over is voluntary and not unavoidable, and the tenant does not explicitly refuse to be bound by the new terms, Griffin v. Knisely, 75 Ill. 411; Commercial Cable Bldg. Co. v. McKenna, Sup., 168 N.Y.S. 13; Stees v. Bergmeier, 91 Minn. 513, 98 N.W. 648, 649, we deem it to be well established that it is not necessary that the landlord and his tenant shall have arrived at an express new agreement, either written or oral, for continued occupancy beyond the expiration of the lease, in order to rebut the presumption that the holding over is upon the same terms as in the original agreement.

In Griffin v. Knisely the Supreme Court of Illinois expressed itself as follows:

"The next question is, whether appellant, continuing to hold over after the expiration of his term, and with full notice that, if he did so, he would be charged for the rent of the whole property, at the rate of $12 per foot on Halsted Street, is to be charged only with the same rent, which he paid the preceding year for half of the property which he then occupied. This is the claim,

made by appellant; he concedes that, if he had held over, after notice of the terms, without objection, he might be held responsible upon the contract. But what difference can his objection make? The property belonged to appellee, and he surely might charge for its use what he pleased. If appellant was not willing to accede to his terms, he should have left the property. He had no right to remain in possession against appellee's wishes, and force him to accept himself as a tenant, on the same terms that he held the property the preceding year. Notwithstanding his objection to appellee's terms, inasmuch as appellee did not, upon his urging his objections, consent to modify them, his subsequent holding over raises the presumption that he finally concluded to accede to them—and that his tenancy from May 1, 1871, to May 1, 1872, was by contract."

In the instant case the facts are much stronger for allowing the plaintiffs to recover than in the case last cited. Here the plaintiffs not only notified the defendant almost two months in advance of the expiration of the written lease that continued possession of the premises after June 30, 1941, would be at an increased rental and with the cost of certain facilities to be borne by the defendant contrary to what had been provided for in the existing lease, but the defendant did nothing, either before or after the expiration of the lease (at least until after its vacation of the premises on August 17, 1941) to indicate in the slightest degree that it had any objection to the new terms stipulated by plaintiffs.

Under the original lease dated July 26, 1938, as amended and renewed by supplemental agreements extending the term to June 30, 1941, the defendant was required to pay to the plaintiffs for the period from July 1, 1940, to June 30, 1941, a monthly rental of $550 for the occupancy of the entire second, third, and fourth floors of the Courts Building. During such period the plaintiffs were required under the terms of the lease to furnish the following:

"Electric current for lighting, for electric fans and for ordinary office equipment, together with the necessary lighting fixtures, sockets, bulbs, wall plugs, etc.; cold water at all times and hot water when the fur-

nace in the building is in operation; adequate heat; adequate toilet facilities and supplies; window shades on all windows; janitor service for the daily cleaning of toilet rooms; all supplies and materials necessary for the satisfactory cleaning of office rooms, corridors, and toilet rooms; and the keeping of the said lighting, heating, and plumbing fixtures in good repair."

In its letter of May 6, 1941, through its agents, Boss & Phelps, plaintiffs proposed to defendant a new lease as follows:

"To give a one year lease beginning July 1, 1941, at a monthly rental of seven hundred dollars ($700). The leasors are to furnish heat and keep the building in repair. The Government, in addition to their monthly rent, is to pay for all charges for electric current, supplies, cleaning and janitor service and water rent if there be any charge for same."

Under date of July 14, 1941, the defendant forwarded to plaintiffs for signature a form of renewal agreement to extend the lease for the period July 1, 1941, to June 30, 1942, with a proviso for termination by the Government at any time upon thirty days' notice. This proposed renewal agreement, after a recital that "Whereas it is desired by the parties hereto to provide for the renewal of said lease, as amended; to increase the annual rental rate to be paid by the Government and to provide that the Lessor shall not be required to furnish certain services under the lease, as amended," witnesses the agreement between the parties thereto that the annual rental rate to be paid by the Government is increased from six thousand six hundred dollars to eight thousand four hundred dollars and that

"It is further understood and agreed by and between the parties hereto that the Lessor is hereby released from furnishing to the Government electric current for lighting, for electric fans, and for ordinary office equipment; water; janitor service for daily cleaning of toilet rooms; and all supplies and materials necessary for the satisfactory cleaning of office rooms, corridors, and toilet rooms."

On the same day that plaintiffs received the proposed renewal agreement from the

Government their agents, Boss & Phelps, returned it to the Government, calling the latter's attention to two pencilled notations inserted by the lessor in the last paragraph on page one of the agreement (the paragraph we have just quoted) and requesting that the Government rewrite said paragraph as follows:

"It is further understood and agreed by and between the parties hereto that the Lessor is released from furnishing to the Government electric current for lighting, for elevator operation, for electric fans, and for ordinary office equipment; water; janitor service for daily cleaning of leased premises; and all supplies and materials necessary for the satisfactory cleaning of office rooms, corridors, and toilet rooms."

It will be noted that while the language of the paragraph quoted from the renewal agreement drafted by the Government is not as broad as that in plaintiffs' letter of May 6, 1941, or in plaintiffs' requested revision of said paragraph, so far as reference is made to electric current and janitor service, it does undertake to release the lessor from furnishing to the Government electric current and janitor service, in almost the exact terms by which this burden was cast upon the lessor by the provision of the original lease we have quoted hereinabove. It seems obvious, therefore, that the revision requested by plaintiffs on July 14, 1941, was concerned with no more than a matter of draftsmanship. It was in no way inconsistent with the conditions stipulated in plaintiffs' notification to defendant under date of May 6, 1941, for a continued use of the premises after June 30, 1941. Having remained in possession of the premises after termination of the original lease, as amended, without protest or disavowal of the new terms imposed by the lessor, defendant had shown an acceptance of those terms. A contract thus existed between the parties whereby defendant was bound to pay, not only the increased rental, but in addition whatever electric current and janitor service it might require in the use of the leased premises.

The submission by defendant to plaintiffs, for their signature, of the renewal agreement, and the return of the same by plain-tiffs with a request for revision of certain language employed therein was no more than a momentarily unsuccessful attempt of the parties to reduce their prior agreement to writing. If it be conceded that plaintiffs were over diligent in their desire to expressly negative in the formal agreement any obligation to furnish electric current for such elevator service as defendant might require in the use of the upper floors it had leased, and likewise any janitor service for cleaning such premises, their request was for nothing by way of substantive right to which they were not already entitled.

Under the prior lease the plaintiffs had been required to furnish electric current for lighting, for electric fans and for ordinary office equipment, on the three floors occupied by defendant. In actual practice they may or may not have been furnishing electric current for elevator operation during the period prior to June 30, 1941. It seems probable that they did. The lease by its terms did not require them to do so. They were required also to furnish janitor service for the daily cleaning of toilet rooms on the three floors occupied by defendant. They may or may not have been furnishing janitor service for daily cleaning of the balance of the premises leased to defendant. Here it is likely that they did not. Again they were not required to do so by the lease. But in any event under the terms expressed in plaintiffs' letter of May 6, 1941, to which defendant impliedly consented by holding over without protest, the burden for *all* electric current and *all* cleaning and janitor service for the premises occupied by the defendant was cast upon defendant. The proposed renewal agreement, drafted and submitted to plaintiffs by the defendant subsequent to its holding over upon the termination of the lease, rather than affirmatively reciting that defendant would assume the burden of all electric current charges and all cleaning and janitor service, simply undertook to release plaintiffs from whatever obligation in this respect they had contracted for under the terms of the prior lease.

Defendant, in its brief, has argued that when it submitted the renewal agreement it was willing to sign on July 14, 1941, and

plaintiffs failed to sign, requesting that the clause with reference to electric current and janitor service be rewritten, "obviously the parties were far apart." The inference is sought to be left that the parties were unsuccessfully attempting, throughout the period between termination of the prior lease and vacation of the premises in August, to reach an agreement as to how much defendant should pay for its use of the premises during the period it held over; that having failed to reach an agreement, the Government vacated the property, and hence should not now be required to pay the increased rent "which the owners had in mind, but which was never agreed upon."

We are not impressed with this argument. Three days after submitting the proposed renewal agreement to plaintiffs, providing for an increase in the rental charge from $550 to $700 per month, and a somewhat less time after the return of the agreement to it for revision of the clause regarding electric current and janitor service, defendant exercised its right to terminate its tenancy by serving notice that it would vacate the premises on August 17, 1941. There is nothing to suggest that this action was taken by the Government because of plaintiffs' request, or because the Government considered remote the chances of agreement upon the terms to be contained in the proposed lease. We are justified in concluding that the Government's decision to terminate was for reasons of its own quite unrelated to the current efforts of the parties to reduce their prior understanding to writing. In terminating its tenancy upon thirty days' notice it did no more than it would have been entitled to do if the proposed renewal agreement had been signed by both parties on July 14.

Let us suppose that plaintiffs had not been quite so diligent in returning the proposed agreement to defendant, or that defendant had decided to serve its notice of intention to terminate so shortly after tendering the agreement to plaintiffs that the latter would have had insufficient time to take any action whatsoever with regard to it. Can it be that the Government would have contended it was liable for no more than rental at the old rate of $550 per month, for the period between July 1, 1941, and August 17, 1941, if it had given notice of intention to terminate before plaintiffs had had a reasonable opportunity to indicate either their approval or disapproval of the agreement as written? The defendant concedes in its brief that if plaintiffs had signed the agreement this case would not be before the court, but it appears to be its position that because both parties knew a written lease was contemplated, no departure can be made from the terms of the original lease until such time as that intention is fulfilled. We conceive the law to be otherwise, as stated in Herb et al. v. Day, Sup., 139 N.Y.S. 931, 933:

"A lease for a year comes into existence as soon as the parties have come to an agreement upon all the terms, even though they intend thereafter to enter into a written contract as evidence of the prior parol agreement. The same rules that govern the making of other parol contracts are applicable to the making of parol leases. Where one side has stated the terms upon which he will make the contract, and the other side has by words or acts shown an acceptance of those terms, a contract is made between the parties.

"In this case the defendant knew that the plaintiffs expected him to enter into a valid lease for one year before he entered into possession of these premises. The plaintiffs stated the terms upon which they would make the lease, * * * the defendant never objected to any of these terms * * * but entered without objection into possession * * *. Knowing that the landlord had offered possession upon certain terms, the defendant, by accepting and retaining possession for months, has clearly evinced his acceptance of these terms, and is bound by his contract."

Defendant has failed to bring to our attention any authorities which would indicate that a different rule should apply where the Government chances to be the lessee. Sequoia Mills v. United States, 60 Ct.Cl. 985, which defendant submits as decisive of this case, and Carr v. Duval, 14 Pet. 77, 10 L.Ed. 361, are clearly not in point. These cases dealt with the right to

terminate an offer for want of a sufficient acceptance, at a time when the contractual relationship of the parties was wholly executory. They could have a bearing on this case only if the efforts of the plaintiffs and the defendant in this case to agree upon the terms of the renewal agreement had occurred prior to June 30, 1941. In that event Cleborne v. Totten, 61 App.D.C., 69, 57 F. 2d 435, and Goldstein v. United States, 79 Ct.Cl. 477, would perhaps merit our attention.

We conclude that this is not a proper case for application of the rule contained in 19 Comp.Gen. 222 which was the basis for rejection of plaintiffs' claim, and that no implication of a continuance of defendant's tenancy upon the same terms as in the prior lease is justified upon the facts.

It has seemed advisable to cite authorities and quote from the record in order to make the necessary distinctions, and yet we finish with a feeling of futility. After going through the record the question narrows to the interpretation to be placed on the letter of notice which plaintiff gave. The defendant contends that their respective interpretations leave the litigants miles apart. The plaintiff in effect replies tweedle-dee. An old atheist once said that when ants were created it was piddling business. I have never respected the atheistic viewpoint, but having read a considerable record of testimony and documents and sixty pages of briefs and authorities which finally simmer down to the one point, I can appreciate his aggravation.

The letter says *all* electric current, cleaning and janitor service. That seems rather clear. There is no principle involved here. It is only a question of what rule of law to apply to the facts of the instant case. The whole case involves $284.17.

■ Even if it were held that the terms of the contract had not been substantially agreed upon the defendant would be in no better position. Manifestly after plaintiffs' notice of May 6, defendant was not entitled to hold the premises under the terms of the old lease. In the absence of a complete agreement on terms plaintiff would be entitled, on a quantum meruit basis, to recover the reasonable rental value of the premises for the period they were actually occupied by the defendant after the termination date of the old lease. We find that the reasonable rental value of the premises for that period, in the circumstances disclosed by the record, to be at the rate of $8,400 a year, plus the cost of electricity and janitor service as set out in plaintiff's letter of May 6. Semmes and Barbour v. United States, 26 Ct.Cl. 119, 131; Arnold Realty Co. v. William K. Toole Co., 46 R.I. 204, 125 A. 363.

We would hesitate to explore the legal costs of settling this dispute. After reading the record there was a temptation to write an opinion of only a few lines. But yonder on the hill sits the Supreme Court which has the final say. If we discussed none of the numerous cases cited by the litigants that court might logically conclude that the case hadn't been given proper attention.

Plaintiffs are entitled to recover the sum of $284.17.

It is so ordered.

WHALEY, Chief Justice, and WHITAKER and LITTLETON, Judges, concur.

MADDEN, Judge, took no part in the decision of this case.